928 F.Supp. 874 (1996)
Melvin O. CHITWOOD, Plaintiff,
v.
Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.
No. 1:94CV000135LMB.
United States District Court, E.D. Missouri, Southeastern Division.
April 12, 1996.
*875 *876 Donald R. Rhodes, Bloomfield, MO, Terry R. Rottler, President, Elpers and Rottler, P.C., Sainte Genevieve, MO, for Melvin O. Chitwood.
Madeleine B. Cole, Office of U.S. Attorney, St. Louis, MO, for Social Security Administration.

MEMORANDUM AND ORDER
BLANTON, United States Magistrate Judge.
This is an action under 42 U.S.C. § 405(g) for judicial review of the defendant's final decision denying the plaintiff's request for waiver of recovery of overpayment under Title II of the Social Security Act. 42 U.S.C. §§ 404 et. seq. Both parties have moved for summary judgment and this case is before the undersigned United States Magistrate Judge by consent of the parties pursuant to 28 U.S.C. § 636(c).

Procedural History
Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 et seq. and supplemental income benefits pursuant to Title XVI[2] of the Social Security Act, 42 U.S.C. § 1381 et seq. alleging disability beginning May 22, 1975 due to depression, nerves and a back injury. (Tr. 104-107).[3] On December 29, 1976, it was determined that plaintiff's mental impairments met the Listing of Impairments as set forth in 12.03A, and plaintiff was awarded benefits by reason of a primary affective disorder. (Tr. 102-103, 108).
On April 7, 1982, plaintiff was sent a letter at Box 82, High Ridge, Missouri 63049. The letter reflects that plaintiff was being reviewed for continued benefits. (Tr. 169).
On April 7, 1982, a representative from the Social Security Administration attempted to contact plaintiff by phone at his "old number." There was a different resident at that number. (Tr. 192).
Plaintiffs wife, Pat Chitwood signed for registered mail from the Social Security Administration on April 3, 1982. The letter was addressed to Box 82, High Ridge, Missouri 63049. (Tr. 195-196).
A document entitled Social Security Notice to Visit Office, dated April 23, 1982, is set forth in the record. In the document, a claims representative from the Social Security Administration indicated that he would like talk to plaintiff about his continued entitlement to disability benefits. Plaintiff was instructed to make arrangements if he was not able to come to the Social Security office prior to April 30, 1982. (Tr. 194).
A Request for Field Contact form, dated May 14, 1982, is set forth in the record. The form indicates that all attempts to contact plaintiff had been unsuccessful. That form states that the Branch Office had made two attempts to contact claimant (once by registered letter).[4] (Tr. 127).
A Report of contact dated May 20, 1982, reflects that plaintiff's "landlord/friend" Mrs. Valdez was contacted. It was noted that "she knew that Chitwood receives DIB." (Tr. 189).
A Cessation or Continuance of Disability or Blindness Determination and Transmittal form, dated June 2, 1982, is set forth in the record. It was determined that plaintiff's benefits ceased March of 1982, making May of 1982 the last month in which he was entitled to benefits. The rationale section states that:
This 49 year old claimant has been receiving Title II disability benefits with an effective onset in May of 1975 due to a primary affective disorder, depressed. Folder was forwarded to state agency for continuing disability investigation as part of the periodic review study. Multiple efforts by both state agency and the Social Security District Office to contact the *877 claimant and to gain his cooperation in this matter has been unsuccessful. Accordingly, a cessation of benefits is recommended. Due process was afforded.
(Tr. 121-126).[5]
On June 14, 1982, plaintiff was notified that his benefits had been terminated. (Tr. 171).
On April 8, 1983, plaintiff applied for disability benefits pursuant to Title II, alleging disability beginning May 28, 1982 by reason of heart problems and high blood pressure. (Tr. 115-118). In the application, plaintiff reported returning to work over two years prior to the application and stopping work in April of 1982 (right before his heart attack). (Tr. 116).[6]
Plaintiff's application was denied initially on June 16, 1983. (Tr. 109-114).
On June 16, 1983, plaintiff completed a Work Activity report. Plaintiff indicated that he began working in 1978 and quit working in April of 1982. Plaintiff stated:
After I went back to work I did not get any social security checks. One year after I returned to work, I got one check and the Clayton office called me and asked me to send the check back. If checks were issued during the time when I went back to work, I have no idea what happened to them.
(Tr. 128-130).[7]
On June 24, 1983, plaintiff was contacted by the Social Security Administration. The representative reported that plaintiff denied receiving any checks after returning to work in 1978. Plaintiff reported being contacted by the Social Security Administration the previous year when he was hospitalized in Memphis, Tennessee. Plaintiff thought the situation had been straightened out. (Tr. 159).
A November 1983 Report of Contact states that:
Review of prior file is necessary before action on this termination. Apparently referral for fraud investigation was previously made but we were not able to locate previous investigation.
(Tr. 157).
A revised Cessation or Continuance of Disability or Blindness Determination and Transmittal dated December 27, 1983, is set forth in the record. The transmittal indicates that plaintiff returned to work in January of 1978. It was observed that there was a trial work period from January of 1978 through September of 1978. It was determined that plaintiff ceased being eligible for benefits at the close of the 1st day of December 1978. It was also noted that plaintiff's benefits had been terminated in 1982, as a result of a periodic review, for failure to cooperate. (Tr. 119-120).[8]
A Social Security Notice dated February 26, 1984, is set forth in the record. The notice states in part that:
Upon receipt of additional information about your work activity, we had your claim reevaluated to see if the previous decision to cease your benefits was correct. After careful review of the evidence, it has been determined that the prior decision must be revised to find that your disability ended in October 1978.
A period of disability was established for you beginning May 1978 because of depression. Subsequently, you returned to work and had worked in at least 9 different months prior to October 1978. Your work at that time and thereafter with earnings averaging over $260.00 per month was determined to have demonstrated your ability to engage in substantial gainful activity despite any impairment.
* * * * * *
Our records show you received $19,060.10 more in Social Security benefits than you should have. This happened because you *878 were paid benefits for 40 months after December 1978. The above amount includes medical insurance premiums of $403.20 which were withheld from your benefit check(s) for the same period.
Also included in the above amount is the sum of $12.20 due for medical insurance premiums due through July 1982.
You should refund the amount shown above within 30 days from the receipt of this letter.
(Tr. 133-135).
On May 16, 1984, plaintiff was notified (at an address in Memphis Tennessee) that his $19,046.70 repayment was overdue. (Tr. 168).
On September 13, 1985, plaintiff was notified that his $19,046.70 repayment was overdue. (Tr. 166-167).
On March 11, 1986, plaintiff again applied for benefits pursuant to Title II, alleging disability beginning May 28, 1982 by reason of heart problems, high blood pressure, emotional problems and "stomach." (Tr. 80-83).[9]
A computer print out dated August 5, 1988, contains PIA history entries from 1975 through 1982. (Tr. 164-165).
On November 12, 1990, plaintiff applied for disability benefits pursuant to Title II, alleging disability beginning May 28, 1982, by reason of coronary artery disease, ulcers, emotional problems and neuropathy secondary to chronic alcoholism. (Tr. 98-101).
On October 1, 1991, plaintiff filed a request for waiver of the overpayment. Plaintiff asserted that he did not receive the overpayment and that he returned the one check that he did receive. (Tr. 136-141).
On April 24, 1992, an ALJ determined that plaintiff had been under a disability as defined by the Social Security Act since October 21, 1986 and was entitled to benefits beginning on that date. (Tr. 84-97).
A letter dated September 2, 1992 from Diana Dewar (Government Benefits Consultant) with Disability Services Incorporated, requesting that plaintiff's Request for Waiver of Overpayment be considered an appeal of the February 8, 1984 determination regarding the overpayment issue. Ms. Dewar pointed out in the letter that the determination of February 26, 1984 did not address plaintiff's contention that he did not receive the overpayment. Ms. Dewar also indicated that plaintiff did not appeal the 1984 decision because he thought the matter had been resolved. Ms. Dewar reported that plaintiff has a long history of mental impairment and should not be penalized by the Social Security Administration's failure to take timely action regarding plaintiff's allegations of nonreceipt. Ms. Dewar's letter also reflects that no decision had been made on plaintiff's request for waiver which had been filed in October of 1991. (Tr. 142-143).
An October 1, 1992 reconsideration decision is set forth in the record. The decision reflects that:
A request was made on Melvin's behalf for photocopies of the checks in question. The Department of the Treasury has advised us that they are unable to provide photocopies for those years [January of 1979 through May of 1982] as their records reflect that the checks have been paid and destroyed due to the expiration of the Statute of Limitations, as set forth in 31 USC 122, for making a claim against the United States for the proceeds of a government check. Section 2 of the Act of June 22, 1926 ... provides that: "Hereafter all claims on account of any check, checks, warrant or warrants appearing from the records of the General Accounting Office or the Treasury Department to have been paid, shall be barred if not presented to the General Accounting Office of the United States Treasury Department within 6 years after the date of issuance of the check, checks, warrant or warrants involved."
(Tr. 147-148).
A Report of Contact dated October 26, 1992, reflects that contact was made with Ms. Dewar. It was observed that plaintiff was *879 not requesting a waiver. Plaintiff was alleging that he never received the payments in question. Plaintiff felt he had been disadvantaged by the Social Security Administration's failure to conduct a timely investigation. (Tr. 156).
A computer print out of plaintiff earnings (printed November 16, 1992), is set forth in the record. (Tr. 151).
A hearing was held on the overpayment issue before an Administrative Law Judge (ALJ) on March 1, 1993. (Tr. 27-78). The ALJ determined that plaintiff was overpaid by $19,046.70 and that overpayment was not waived. (Tr. 13-26). The Appeals Council denied review. (Tr. 6-7).

Testimony Before the ALJ
Plaintiff was present at the hearing and was assisted by a representative. At the time of the hearing, plaintiff was 59 years old. Plaintiff reported that he has an eighth grade education. (Tr. 30).
Plaintiff testified that he received disability benefits for alcoholism. He reported that he received the benefits from 1975 until he started working in 1978. (Tr. 31-32). Mr. Chitwood testified that he went to work early (so he could call the Social Security Office toll free before he started work) on his second day back on the job in 1978 and called the Social Security Office in Clayton, Missouri.[10] Plaintiff asserted that he told the individual at the Social Security office that he had returned to work. (Tr. 40-41).
Plaintiff related the various addresses where he and his wife had lived. (Tr. 35). Plaintiff testified that he was living in High Ridge, Missouri in 1978 when he returned to work. Plaintiff had been receiving his checks at a post office box in High Ridge, Missouri. Plaintiff and his wife had access to the post office box. (Tr. 38, 42).
Plaintiff reported that he stopped receiving checks after he called and reported returning to work. Plaintiff indicated that he did receive one check from the Social Security Administration about a year after he returned to work. (Tr. 42). Plaintiff returned the check. (Tr. 43). Plaintiff complained that he first learned of the alleged overpayment in 1984 when he applied for benefits again. (Tr. 45-46).
Plaintiff testified that he stopped working in April of 1982 because of back problems. He then went to visit his daughter in Memphis, Tennessee. While visiting his daughter, plaintiff suffered a heart attack in May of 1982. Plaintiff remained in Memphis for six months. (Tr. 36, 44). Plaintiff was separated from his wife for some period after having the heart attack. (Tr. 51). Plaintiff testified that he returned to the Hyland Center for alcoholism treatment in 1978 or 1979 and again in 1984 or 1985. (Tr. 47-48).
Plaintiff testified that he had been receiving benefits from Chrysler in the 1980's that were supposed to cease when he began getting disability or returned to work. Since the Social Security found him disabled beginning in 1986 and awarded retroactive benefits, Chrysler suspended plaintiff's pension payments to cover reimbursement of the sick pay or pension benefits he was receiving when he was supposed to have been receiving Social Security benefits. (Tr. 56-60, 77-78).[11]
Plaintiff's wife testified at the hearing. Mrs. Chitwood testified that she recalled her husband receiving the one check following plaintiff's return to work. She indicated that someone from the Social Security Administration had called on the day that he received the check and demanded that it be returned. (Tr. 61). Mrs. Chitwood testified about the various addresses where she and her husband had lived. (Tr. 63-71).

The ALJ's Determination
The ALJ made the following findings:
1. The claimant received benefits of $19,046.70 during the period from January, 1978 through June, 1982.

*880 2. The claimant was working and was engaged in substantial gainful activity during this period.
3. There was an overpayment of benefits in the amount of $19,046.70.
4. The claimant was at fault in causing the overpayment.
5. Recovery of the overpayment is not waived.
6. The claimant and his wife were not credible witnesses on this issue.
(Tr. 25).
Based on these findings, the ALJ concluded:
It is the decision of the Administrative Law Judge that the claimant was overpaid by $19,046.70, and that recovery of the overpayment is not waived.
(Tr. 26).

Discussion
Plaintiff asserts that the ALJ's determination is not supported by substantial evidence on the record as a whole. Specifically, plaintiff asserts that the Commissioner has not met her burden of establishing that an overpayment exists. In the alternative, plaintiff asserts that if he was overpaid then he is entitled to a waiver of the overpayment (i.e., that he was without fault and to allow recoupment would defeat the purposes of the Act and be against equity and good conscience).
Defendant, on the other hand asserts that substantial evidence on the record as a whole supports the ALJ's determination.
The undersigned concludes that the ALJ's decision is not supported by substantial evidence on the record as a whole.
The court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. Neely v. Shalala, 997 F.2d 437, 439 (8th Cir.1993). Substantial evidence is evidence which reasonable minds would accept as true and adequate to support the Commissioner's conclusion. Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir.1992). The court will not reverse a decision simply because substantial evidence may support the opposite conclusion. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). As part of the court's analysis, the undersigned "must take into account that evidence in the record which `fairly detracts from the weight of the evidence supporting the ALJ's decision' and apply a balancing test to all of the evidence." Loving v. Department of Health & Human Servs., 16 F.3d 967, 969 (8th Cir.1994). The Commissioner's determination should be reversed, if "`a reasonable factfinder would have to conclude' otherwise." Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir.1994) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992)).

Existence of the Overpayment:
The Commissioner is required to recover overpayments of Social Security benefits. 42 U.S.C. § 1383(b)(1). Recovery of social security benefits is governed by 42 U.S.C. § 404(a), which provides that recovery shall be made for overpayments. However, the Commissioner may not recoup payment(s) from:
any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.
42 U.S.C. § 404(b); See also, 20 C.F.R. § 404.506.
The statute does not specify which party bears the burden of proving the existence of an overpayment. However, those courts which have decided the issue, find that it is the Commissioner's burden to establish the fact of an overpayment. Cannuni on Behalf of Cannuni v. Schweiker, 740 F.2d 260, 263 (3rd Cir.1984) ("The statute does not designate which party bears the burden of proof to establish the fact of overpayment. We agree with the court of Appeals for the Eighth Circuit that when the government seeks to recover an alleged overpayment, it must demonstrate that the claimant was not entitled to the Social Security funds."); Burrow v. Finch, 431 F.2d 486, 491 n. 5 (8th Cir.1970) ("Where the Commissioner asserts the claim of overpayment by reason of `fault' under § 404(b) ... there is no logical reason *881 why the party asserting the claim should not bear the traditional burden of proving it."); see also, United States v. Smith, 482 F.2d 1120, 1124 (8th Cir.1973); Morency v. Bowen, 677 F.Supp. 260, 262 (D.N.J.1988); McCarthy v. Bowen, 668 F.Supp. 1439, 1441-1442 (D.Or.1987).
The undersigned finds that the Commissioner has not met her burden of establishing the fact of an overpayment. It has clearly been established that plaintiff worked from a period in 1978 through April of 1982. It has also been clearly established that plaintiff, having been substantially gainfully employed, was not entitled to Social Security benefits during that period. What has not been established, however, is that plaintiff continued to receive Social Security benefits during that period.
The ALJ listed a number of reasons for finding that the overpayment occurred. Initially the ALJ noted that the Social Security Administration would not have reviewed his case for continued benefits if he were not still receiving benefits.
However, the fact that plaintiff was scheduled for periodic review (i.e., his condition was expected to improve) does not necessarily indicate that he was actually receiving benefits. Plaintiff may have been scheduled for this review at the time he was awarded benefits. (Even conditions not expected to improve are to be reviewed within 5 to 7 years, non-permanent conditions more frequently. 20 C.F.R. § 404.1590(d)). Plaintiff may or may not have been removed from the list of persons scheduled to be reviewed if and when he informed defendant that he returned to work. While this review may tend to show that plaintiff received benefits during this period, it does not amount to substantial evidence that plaintiff in fact received the overpayment.
The ALJ also found that Exhibit 14 confirms the level of benefits that the claimant was paid during the period 1978 through June of 1982 when his benefits were terminated. (Tr. 23). The computer print out to which the ALJ refers, generated in August of 1988 shows only plaintiff's PIA (primary insurance amount) history. (Tr. 164-165). The PIA history only demonstrates how plaintiff's benefits would have been calculated, not that checks were actually issued. Accordingly, this factor is also not particularly persuasive for finding that the payment occurred. It is interesting to note that no records were introduced which showed that any checks were issued or payments were made.
The ALJ also referred to Report of Contact in which plaintiff's landlady/friend, Mrs. Valdez is reported to have said that she know plaintiff "receives DIB." Mrs. Valdez was apparently plaintiff's landlady for a number of years, including the time when plaintiff was still receiving payments in 1977 (the exact time frames of plaintiff's living arrangements are not clear from the record). The secondhand statement of what the landlady knew about plaintiff's income is not persuasive. In addition, Mrs. Valdez could have been referring to payments by Chrysler's insurance carrier.
Finally, the ALJ found it significant that plaintiff did not respond to the defendant's attempts to contact him in 1982 and evaluate his disability status. The ALJ observed that "[o]ne cannot help but notice that claimant left the St. Louis area and went to Memphis at about the same time that the Administration was undertaking a review of his benefit status." (Tr. 24).
Initially, it should be noted that the Social Security Administration apparently only discovered that plaintiff worked during 1978 through April of 1982 because plaintiff advised the Social Security Administration of this fact when he applied for benefits in 1983.
The record reflects that in 1982, the Social Security Administration determined that plaintiff was no longer entitled to benefits based on his failure to respond to inquiries about his continued entitlement to benefits. While the defendant and the ALJ took plaintiff's failure to respond to the Social Security Administration's inquiries as evidence that he was avoiding detection, other meaning may derived from plaintiff's actions. Plaintiff was not employed at the time the Social Security Administration tried to contact him. He was in Memphis visiting his daughter. Further, *882 shortly after the Social Security Administration tried to contact plaintiff, he suffered a heart attack (while in Memphis, Tennessee) and would understandably have more important considerations to occupy his time. Also, if plaintiff quit receiving benefits in 1978 as he alleges, it would not seem unusual for him not to be concerned about the Social Security Administration's efforts to determine whether he was entitled to continued benefits. He testified he thought "some bookkeeper has made a mess up." (Tr. 46).
In fact, if one accepts the defendant's position and finds that plaintiff did not inform the Social Security Administration that he started working, it would appear that the defendant first learned of plaintiff's employment when he applied for benefits in 1983. However, if plaintiff was not working in April of 1982 and suffered from a heart attack in May (and the Social Security Administration knew nothing about his work activities), it would seem to be in plaintiff's best interest to cooperate with the Social Security Administration to establish his continued disability.
The Social Security Administration determined that plaintiff was no longer entitled to benefits in 1982 not by considering the facts or merits but only by default. It concluded that plaintiff ceased being eligible for benefits in May of 1982. (Tr. 171). In April of 1983, plaintiff again applied for benefits. At that time plaintiff put on his application that he had begun working over two years prior to the application and ceased working in April of 1982. (Tr. 116). It was not until plaintiff's application was denied on June 16, 1983 that the Social Security Administration asked plaintiff to complete a Work Activity Report.
In the Work Activity Report completed June 16, 1983, plaintiff denied receiving any Social Security checks after his return to work (other than the one check which he stated that he returned at the Social Security Administration's request). Plaintiff's actions were consistent with his position that he was not receiving benefits in 1982. Thereafter the defendant revised plaintiff's cessation date and concluded that plaintiff had been overpaid.
At that time, and up until 1988, the defendant had the ability to demonstrate conclusively whether or not plaintiff received any benefits. If any checks were issued to plaintiff between October of 1978 and any time in 1982, those checks would have been available from the Treasury Department upon request of the defendant.[12] Given the six year statute of limitations, the checks would not have been destroyed at the earliest until 1984. Any checks issued in 1982 would not have been destroyed until 1988. However, rather than addressing plaintiff's (who has a long history of mental problems and was unrepresented by counsel) contention that he never received the payments, the defendant focused on the determination that plaintiff was not entitled to benefits during the relevant period (a fact that was not at issue). Production of the evidence of payment, the checks in this instance, is the usual method of satisfying a claimant's burden of proof to show indebtedness by the other party. Here the crucial evidence is missing.
In fact, when plaintiff finally did seek assistance in litigating this matter, the defendant did not even investigate his waiver claim until a year after it was filed, when plaintiff's representative reminded defendant that no decision had been made.
The undersigned finds the defendant's failure to address the issue of nonreceipt (until it was too late to prove that the checks were issued) undercuts its claim that plaintiff received the payments. Also significant is the fact that plaintiff has persisted in the same factual assertions for almost thirteen years.
There is the question of where the record is of plaintiff's alleged call to the Social Security Office to inform defendant that he was working. Defendant has offered no evidence to refute the testimony of plaintiff that he made the call. The absence of a Report of Contact from plaintiff's file is not determinative. Note the efforts of plaintiff's representative between February 24, 1987 and November *883 13, 1990 to locate plaintiff's 1986 application in the files of the Social Security Administration. (Tr. 154). In November of 1983, the Social Security Administration was unable to locate a previous investigation for possible fraud. (Tr. 157). Although disability benefits began December 29, 1976, a Social Security Notice dated February 26, 1984 was addressed to plaintiff stating that a period of disability was established for Mr. Chitwood "beginning May, 1978 because of depression. ..." (Tr. 133). It appears that there are deficiencies in the accuracy and comprehensiveness of the Social Security Administration's records.
The undersigned finds that remand for further proceedings would not be of any benefit. Defendant has had a number of years to establish the existence of an overpayment and has failed to sustain its burden. Cannuni, 740 F.2d at 263; Burrow, 431 F.2d at 491 n. 5.
The ALJ's determination that plaintiff received $19,046.70 in benefits from January 1978 through June 1982 is not supported by substantial evidence on the record as a whole.
Accordingly, defendant not having established the fact of overpayment, the ALJ's decision will be reversed and the Commissioner will be ordered to pay the $18,115.80 withheld from plaintiff's past due benefits.

Waiver:
Since the defendant has not established the existence of an overpayment, the Court need not address the issue of waiver. However, the undersigned observes that even if an overpayment had been found to exist, there is no evidence that plaintiff is at fault. If the recipient of the overpayment is able to show that he is without fault then the statute also places the burden on the recipient to show that repayment would defeat the purpose of the act or be inequitable. Valente v. Secretary of Health and Human Services, 733 F.2d 1037, 1042 (2nd Cir.1984); Henry v. Weinberger, 371 F.Supp. 854, 856 (E.D.Mo.1973).
The Act does not define "without fault", "defeat the purpose of this subchapter," or "equity and good conscience." The Commissioner's definitions of these terms, however, are set forth in the regulations. A recipient is at fault for an overpayment if the overpayment was a result of: his incorrect statement which he knew or should have known to be incorrect; his failure to furnish material information; or his acceptance of a payment which he knew or should have known or could have been expected to know was not correct. 20 C.F.R. § 404.507. Recoupment would defeat the purpose of the subchapter if it would "deprive a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508(a).
The regulations define "against equity and good conscience" as those situations where the recipient: "(1) [c]hanged ... his position for the worse ... or relinquished a valuable right ... because of reliance upon a notice that a payment would be made or because of the overpayment itself; or (2) [w]as living in a separate household from the overpaid person at the time of the overpayment and did not receive the overpayment ..." 20 C.F.R. § 404.509(a).
The Eighth Circuit, however, has found the Commissioner's definition of "against equity and good conscience" too narrow. The Eighth Circuit has adopted the "ordinary, contemporary, common meaning[s]" of these words. "The term equity `denotes the spirit and habit of fairness and justness.'" Groseclose v. Bowen, 809 F.2d 502, 505 (8th Cir. 1987) (citation omitted). "The term conscience means `the sense of right or wrong ... together with a feeling of obligation to do or be that which is recognized as good.'" Id. at 504-5 (citation omitted).[13]

Fault:
In evaluating whether plaintiff is at fault, the Commissioner must consider:

*884 all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations (including lack of facility with the English language) the individual has.
20 C.F.R. § 404.507.
It should be noted that plaintiff was awarded benefits because he met the listing for a mental impairments. The record reflects that when plaintiff was hospitalized in 1975 and 1976, it was for his mental impairments. Medical records of Lutheran Medical Center from August 25th to September 13, 1975 showed that plaintiff had "numerous other mental hospitalizations." (Tr. 103, 170). In fact in 1976, plaintiff could not on many occasions brush his teeth or sign his name. (Tr. 103). Plaintiff did not have a representative payee. Plaintiff was hospitalized for his alcoholism in 1979 (when he was working) and again in 1981 (when he was working) (Tr. 87). While the ALJ found plaintiff's mental history to militate against his credibility, it would seem that plaintiff's severe mental problems and alcoholism would serve to excuse his behavior. Further, while it cannot be proved that plaintiff did not call and notify the defendant of his return to work, it has been demonstrated that plaintiff did report the work activity when he applied for benefits in 1983. He made no effort to conceal his work history. Again, this would tend to reflect positively on plaintiff's credibility.
The ALJ's determination that plaintiff is at fault fails to take into consideration plaintiff's mental status and is not supported by substantial evidence on the record as a whole.

Defeat the Purpose of the Act and/or Equity and Good Conscience:
Additionally, plaintiff has demonstrated that recoupment of the overpayment would defeat the purpose of the act and be against equity and good conscience.
Plaintiff's fixed living expenses are $1,112.00 per month (Tr. 140B). He receives $712.00 monthly in Social Security benefits. Plaintiff is supposed to receive pension benefits from Chrysler. However, plaintiff received benefits from Chrysler for several years, which were supposed to cease if plaintiff became 65 or began receiving Social Security benefits. When plaintiff was awarded benefits in 1992, the award was made retroactive to 1986. Accordingly, Chrysler Corporation sought a refund for the benefits paid to plaintiff when he should have been getting Social Security benefits. To repay these benefits, Chrysler terminated plaintiff's monthly pension benefits of $279.00 a month. While this might not be a problem had plaintiff received the full amount of his past due benefits from the defendant, $18,115.80 of plaintiff's Social Security benefits have been withheld by the defendant to recoup the alleged overpayment. (Tr. 172) (Plaintiff's Memorandum at 10-11). Accordingly, plaintiff is being required to repay the Chrysler Corporation based on Social Security benefits which the Commissioner has not proved he received (or which have been seriously reduced).
This is unjust and deprives plaintiff (who needs substantially all of his current income to meet current ordinary and necessary living expenses 20 C.F.R. § 404.508) of needed income.
Accordingly, even if it had been determined that plaintiff in fact received the overpayment, he has demonstrated that he is entitled to a waiver of the recoupment.
Accordingly,
IT IS HEREBY ORDERED That Shirley S. Chater, Commissioner of Social Security, is substituted for Donna Shalala as the proper party defendant.
IT IS FURTHER ORDERED that the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405 for those reasons set forth in this Memorandum and Order and the Commissioner shall pay plaintiff the $18,115.80 withheld from plaintiff's past due benefits.
NOTES
[1] Pursuant to P.L. No. 103-296, the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security effective March 31, 1995. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure and Program Improvements Act of 1994, Pub.L. No. 103-296, § 106(d), Shirley S. Chater will be substituted for Donna Shalala as the proper party defendant.
[2] While references throughout the transcript are to plaintiff's receipt of Title II benefits only, the decision awarding benefits reflects that plaintiff applied for Title XVI benefits as well. (Tr. 108).
[3] Plaintiff's address at the time of the application was 3716 Meadow Dr., Webber Hill Terrace, House Springs, Missouri, 63051. (Tr. 107).
[4] Plaintiff's address was listed as Box 82, High Ridge, Missouri.
[5] Plaintiff's address was listed as Box 82, High Ridge, Missouri 63049. (Tr. 121).
[6] Plaintiff's address at the time of the application was 123 Glenwood Drive in Fenton, Missouri, 63026.
[7] Plaintiff reported his address as 123 Glenwood, Fenton, Missouri 63026. (Tr. 130).
[8] Plaintiff's address was listed as 123 Glenwood Dr., Fenton, Missouri 63026. (Tr. 119).
[9] There is no decision in the record denying plaintiff's 1986 application. However, a 1992 ALJ decision reflects that plaintiff's 1986 application was denied on October 20, 1986. (Tr. 87). There has been some confusion as to the whereabouts of the 1986 file. (Tr. 154-155).
[10] Plaintiff was working the night shift at the Chrysler plant. He went to work early so that he could place a toll free call to the Social Security Office in Clayton. (Tr. 40).
[11] A more detailed explanation of this situation is explained at page 186 of the transcript.
[12] The Social Security Administration realized the importance of checks to the determination of a payment issue when it requested photocopies of paychecks from Chrysler on August 24, 1983. (Tr. 158).
[13] The court in Groseclose found recoupment to be against equity and good conscience where the Social Security Administration attempted to recover an overpayment of Child's Insurance Benefits by withholding her father's Retirement Insurance Benefits. The child lived in a different state from that of her father. Apparently § (2) of 20 C.F.R. § 404.509(a) was added after Groseclose to cover that factual situation. However, the undersigned believes the definitions set forth in Groseclose to still be applicable.